IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

SHARON HAZELWOOD, )
)
    Plaintiff, )
)
v. ) No. 3:05-cv-356
)
TENNESSEE DEPARTMENT OF )
SAFETY, et al., )
)
    Defendants. )

## **MEMORANDUM OPINION**

This civil action is before the court on the motion of defendant Charles Laxton, sued in his individual capacity, for summary judgment or for judgment on the pleadings [doc. 97]. The plaintiff has responded [doc. 107], and pursuant to the court's order, the plaintiff filed a supplemental brief on the issue of qualified immunity [doc. 136]. The defendant has filed two reply briefs [docs. 111 and 138]. Oral argument on the motion has been heard, and the motion is ripe for the court's consideration. For the reasons stated below, the defendant's motion for summary judgment will be granted.[1]

---

[1] The court finds it necessary to rely on matters outside the pleadings in its consideration of the motion; therefore, the defendant's motion will be considered a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

In her complaint, the plaintiff alleges that defendant Laxton, after he was promoted to Captain of the Tennessee Highway Patrol, began to "harass, retaliate and other wise discriminate against those employees" who had not supported the Democratic candidate for governor of Tennessee. The plaintiff claims that she was one of those employees. The plaintiff says that Laxton unjustly harassed her about her job performance, took away tasks, responsibilities, and supervisory authority, and used other employees to carry out his harassment. The plaintiff further claims that Laxton ordered and conducted "bogus" internal affairs investigations concerning the plaintiff, and finally ordered her to submit to a "fitness-for-duty" evaluation, the end result of which was the termination of her employment with the Tennessee Highway Patrol. She raises three causes of action pursuant to 42 U.S.C. §§ 1983 and 1985: (1) retaliation for exercising her First Amendment speech rights; (2) violations of her First Amendment rights of political association; and (3) violations of her Fifth and Fourteenth Amendment procedural and substantive due process rights.[2] She seeks compensatory and punitive damages as well as attorney's fees.

---

[2] In her response to the motion for summary judgment, the plaintiff states that she has "two theories of recovery: (1) that she was unjustly harassed and terminated as a direct result of her political affiliation; and (2) that she was unjustly harassed and terminated as a direct result of the exercise of her Fourteenth Amendment rights [of] intimate association." In the Sixth Circuit, the right of intimate association is analyzed under the First Amendment. *See Sowards v. Loudon County*, 203 F.3d 426, 432 (6th Cir. 2000). The court also notes that the plaintiff appears to have abandoned her due process claims.

# I. Factual Background

The plaintiff began working at the Tennessee Highway Patrol ("THP") in the Knoxville, Tennessee office in about 1976. She rose through the ranks until she reached the position of Communications Dispatch Supervisor. For most of the years until the incidents related to this lawsuit, she routinely received an "exceptional" ranking on her employee evaluations.

In February 2003, following the election of Bredesen, the Democratic candidate for governor, defendant Laxton was promoted from sergeant to captain, skipping over the rank of lieutenant. The plaintiff alleges in her complaint that Laxton was promoted because he supported the election of Governor Bredesen. She also states in her response to the defendant's motion that "Laxton was a Democrat and had contributed heavily to Governor Bredesen's 2002 election." Throughout the plaintiff's deposition she claims that "everybody knows what everybody is" when asked about co-workers' political affiliations. As far as the court can tell, there is no proof in the record, by way of sworn testimony or admissible documents, that supports her statements about Laxton's political affiliation. For purposes of this motion, however, the court will assume that Laxton is a Democrat and that the plaintiff could prove it at trial.

Laxton was in charge of the Knoxville office of the THP. The plaintiff's immediate supervisor was defendant Lieutenant Larry French.[3] The

---

[3] Lieutenant French remains a defendant in this lawsuit in his official capacity only.

plaintiff says that after Laxton was promoted she and other employees were called into his office.  During her visit, she says that Laxton told her that she had been allowed to "run wild" and it was "coming to a stop."  The plaintiff also stated in her deposition that Laxton told her on several occasions that "they wanted their people" in supervisory positions.  She took that to mean Democrats.  She also said that Laxton let her know that she was not on the "right side."

The only evidence in the record concerning the plaintiff's party affiliation and Laxton's knowledge of it comes from the plaintiff's deposition and Laxton's affidavit.  When asked at her deposition, the plaintiff denied being a registered member of the Republican party but admitted that she usually voted for the Republican candidate.  As to the governor's race, she stated that she had bumper stickers on her car, presumably for Republican candidates, but there was a policy that the employees had to park at the motel next door if they had political bumper stickers on their cars.  When asked about Laxton's knowledge of her political affiliation, she stated that he knew because "everybody knew what everybody was," and when some co-workers were teasing her about the bumper sticker, Laxton did not laugh.  Laxton stated in his affidavit that he did not know and did not make any employment decisions based on the plaintiff's political affiliation.

Interestingly, when the plaintiff was asked about the political affiliations of co-workers, she denied knowing that information and stated that she

4

"never paid attention to things like that" and that she had "never been a political person." Nevertheless, it was her opinion that the THP was a political organization and she stated that politics got her the job and promotions, but then admitted that she was hired under a Democratic governor and received promotions when Democrats were in office.

In October 2003, a co-worker, Lt. Farmer, was being investigated by defendant Colonel Rucker of internal affairs.[4] She said that when she tried to speak up for Lt. Farmer, she was told to distance herself from Farmer and to worry about her own problems, not Farmer's.

Lt. French prepared an evaluation of the plaintiff's performance in April 2003, a few months after Laxton was promoted. She received "exceptional" rankings in all areas except her supervisory duties. There, she received only a "good" which is two levels below exceptional. Lt. French explained this ranking: "Ms. Hazelwood has had a medical condition that prevents her from her ability as a (5) exceptional. Due to the medical problem her supervisory duty has been hampered because she has had to miss work." By memorandum dated November 11, 2003, the plaintiff received a written warning concerning her absences. Lt. French stated in the memorandum that she had taken 110 sick days during the previous twelve months. She was told that she would only be allowed to work her assigned shift and that she had to have a doctor's statement

---

[4] Colonel Rucker remains a defendant in this lawsuit in his official capacity only.

for all future sick leave.  She was also advised of her appeal rights, but she did not appeal the findings in the memorandum.

The plaintiff's sick leave absences continued.  She was next evaluated on July 6, 2004.  Her ranking was "marginal" at that time.  Lt. French summarized his evaluation as follows:

> Supervisor Hazelwood has met all the requirements set forth in her job responsibility.  During this rating period Supervisor Hazelwood has worked approximately 55% of the year.  Of approximately 262 work days she has worked only 144 complete days.  Although these problems are not in her control, these problems keep her from performing her job responsibilities in a normal manner.  Job responsibilities are not performed or are late due to these absences.  Employee evaluations are not on time.  Investigations are not completed in a timely manner.  Meetings which require her attendance are sometimes not attended. . . . This evaluation is based on her performing her job responsibilities as a supervisor of several other employees who depend on her performance.  I have assumed these job responsibilities in her absence.  This Annual Evaluation was not conducted on the due date because I have not had the opportunity to conduct it with her due to her absences.  I recommend that she receive all raises due to her as a state employee.

The plaintiff disagreed with the evaluation and wrote that additional responsibilities of her job resulted in her illness over the years.  She then wrote that when she and Laxton first met to discuss her evaluation, she had a panic attack.  When Lt. French met with her about a month later, she wrote that she "became sicker again."  She stated that her extended illness was a "direct result

6

of job stress as well as harassment and discriminating treatment. I have needed help instead of damnation."

The plaintiff also became the subject of several internal affairs investigations in August 2004. One complaint was filed by a co-worker who complained that the plaintiff had made threats towards her subordinates and falsified time sheets. Another co-worker complained about the plaintiff's hostile and intimidating behavior, falsification of time sheets, favoritism towards some co-workers, and the plaintiff's lack of authority to use the THP driver's license system. A complaint was also filed against the plaintiff for failing to respond appropriately to a request for help. Officers at the truck scales requested assistance in transporting a drunk driver. The plaintiff told the officers to call the county for assistance and gave them the number to call. She was given a written reprimand and a strong warning related to her failure to "properly answer a call for service."

In March 2004, the plaintiff applied for and was granted Family Medical Leave.[5] She testified that Laxton talked her into taking the leave so she could go home and get well. Her leave was intermittent, meaning that she could work some days but not others. Her doctors diagnosed her as having "panic and anxiety and depression." Laxton assigned her to the driver's license department

---

[5] Interestingly, on the request for leave filled out by her doctor, it states that her symptoms caused by stress began August 28, 1999. The plaintiff explained this as the date she first sought medical treatment for her stress.

because it was less stressful, an opinion with which the defendant did not agree, and she was transferred back to the THP.

In the fall of 2004, defendant Commissioner Fred Phillips of the Tennessee Department of Safety[6] ordered the plaintiff to undergo a fitness-for-duty examination.[7] The plaintiff completed a questionnaire prior to her examination. She stated that her Captain (Laxton) "deliberately puts extra stress on me to make me ill. . . . He causes me to have horrible panic attacks on purpose – thus causing me to work in a hostile work environment." She then stated in her five-page, hand-written Narrative Account:

> The circumstances that led to this "fitness-for-duty" evaluation are the same circumstances that are used to put extra stress on me and lead me to have severe panic attacks on my job. These being the continued, relentless sheer determination of Captain Charles Laxton to run me off. . . . He found that I had problems with cumulative stress from all the years of working 2 & sometimes 3 shifts through the years when communications stayed so short-handed . . . it builds up. When he found out he began to use this on me in every way possible.. . . I think I will always love the job itself – and the people – most are like family to me. If they would not ride me until I have the bad panic attacks I could work & stay caught up & even be free to do some

---

[6] Commissioner Fred Phillips remains a defendant in this lawsuit in his official capacity only.

[7] General Order No. 222 of the Tennessee Department of Safety provides in relevant part:

> C. The Department reserves the right to send an employee to qualified professionals and physicians for a psychological/physical examination.
> D. In the event there is cause to believe an employee may not be capable of performing his/her duties, A director, Section Head or District/Division Captain may submit a request for a physical or psychological examination to determine his/her fitness for duty.

> extra things I've been wanting to get done. However,
> after they do me that way I am sick for days. [After
> taking new medications] I feel better than I have in a
> long time, except when they start on me. . . . I have
> never understood why the Captain can't leave me alone.
> He has persecuted me because of my illness & my age.
> . . . I resent this whole process because it is just his
> latest ploy to try to run me off & put his younger
> replacement in my spot.

The fitness-for-duty examination was conducted by defendant, Dr. Travis McNeal, a psychologist employed by the Department of Safety.[8] After conducting some tests, on December 1, 2004, Dr. McNeal recommended that:

> *Ms. Hazelwood be considered unfit for duty as a dispatcher or dispatch supervisor.* She currently suffers from psychopathology, specifically an anxiety disorder inclusive of panic attacks, that compromises her ability to perform the essential duties of the job. Given the integral role of the dispatcher in routinely managing crisis situations, her impairment could also potentially place others at risk.

[italics in original]. It is noted that the plaintiff's personal psychiatrist disagreed with this evaluation. He agreed that the plaintiff was suffering from "major depression and panic disorder" and subject to panic attacks as a result of the work environment stress. But, he opined that the determination that she was not fit-for-duty was tainted because McNeal was affiliated with the Department of Safety and that a neutral environment would be necessary to get an accurate result.

---

[8] Dr. McNeal remains a defendant in this lawsuit in his official capacity only.

Laxton recommended that the plaintiff's employment be terminated because of Dr. McNeal's finding that she was unfit for duty and her "habitual absenteeism." The plaintiff requested a Due Process Hearing, which was held on January 19, 2005. Commissioner Fred Phillips decided to terminate the plaintiff's employment with the Department of Safety for failing a "Fit-For-Duty Psychological Evaluation," concurring with Laxton's recommendation. He noted in his memorandum to the plaintiff that she had taken over 300 hours of sick, annual and compensatory leave since August 2004 and that this "continued pattern of absenteeism has resulted in you not being able to perform the major functions of your job, and placed an unreasonable hardship on your work unit." The plaintiff appealed this decision through the Department of Safety grievance procedures, and on March 3, 2004, the decision to terminate the plaintiff's employment was upheld.

## II. Legal Discussion

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted, "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." As the Supreme Court stated in *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986), this "plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Thus, the moving party's burden may be discharged by showing that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. In order for a non-moving party to defeat a motion for summary judgment, the non-moving party must come forward with persuasive evidence to support his or her claim or demonstrate that there is a genuine material factual dispute; that is, the non-moving party must produce evidence on which the jury could reasonably find for the non-moving party. *Id.* at 324.

### A. Qualified Immunity

Defendant Laxton has moved for summary judgment based on qualified immunity. Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "This immunity shields officials 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Perez v. Oakland County*, 466 F.3d 416, 426 (6th Cir. 2006 (quoting *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005)). The

plaintiff has the burden of demonstrating that the defendant is not entitled to qualified immunity. *See v. City of Elyria*, 502 F.3d 484, 491 (6th Cir. 2007). In evaluating whether an official or officer is entitled to qualified immunity, the court undertakes a two-part analysis: "(1) whether, considering the allegations in the light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Id.* (quoting *Swiecicki v. Delgado*, 463 F.3d 489, 497-98 (6th Cir. 2006)). Thus, the court will first address whether the plaintiff has alleged facts that, viewed in light most favorable to her, demonstrate that Laxton's conduct violated her constitutional rights.

### B. Plaintiff's Protected Speech Claim

First, the plaintiff alleges that the harassment, disparate treatment, and termination were in retaliation for the exercise of her clearly established First Amendment rights, especially her speech concerning the treatment of other troopers and employees who had not supported Governor Bredesen's campaign. She claims her speech was a matter of public concern and constitutionally protected. She claims that her employment was terminated as a result of engaging in this constitutionally protected speech.

In his motion for summary judgment, Laxton argues that the plaintiff's retaliation/protected speech claim must fail. He submits that her speech, that is, the single incident when she spoke up for her friend Farmer, was not a matter of

12

public concern.  This speech, he contends, was merely a matter of a friend speaking up for a friend related to an internal affairs investigation. The plaintiff did not respond to this argument.

In order to make out a First Amendment speech claim, the first hurdle the plaintiff must overcome is whether, as a public employee, her speech is protected.  *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007).  "To accomplish this, the employee must show that his speech touches on a matter of public concern." *Id.*  Considering the record as whole, the court must look to the content, form, and context of a given statement.  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  In the Sixth Circuit, a matter of public concern "usually involves a matter of political, social, or other concern to the community." *City of Elyria*, 502 F.3d at 492.

At issue in this case is the plaintiff's effort to support her friend Farmer during an internal affairs investigation.  Farmer had been accused of writing an anonymous letter and of reporting another trooper to a TV station concerning building houses for his construction business on state time.  The plaintiff stated in her deposition that Farmer told her he had not written the anonymous letter and she believed him.  She told both Rucker and Laxton that Farmer did not do it because he told her so.  She also told Laxton that Farmer had not reported the trooper to the TV station, but Farmer told her later that he had.

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick*, 461 U.S. at 147.

The court finds that the plaintiff's speech concerning her friend Farmer was not protected because it did not involve a matter of public concern. Nothing she said to Rucker or Laxton about Farmer and the anonymous letter or the TV report was of a "political, social or other concern to the community."[9] Rather, she was trying to protect her friend who was the subject of an internal affairs investigation.

The plaintiff has not established a constitutional violation related to her First Amendment speech claim, and the defendant is entitled to judgment as a matter of law.

### C. Plaintiff's Political Association Claims

The plaintiff also claims that Laxton violated her First Amendment rights of political association. She claims that she supported the Republican candidate for governor of Tennessee in 2002, but when the Democratic candidate

---

[9] In another lawsuit pending before this court, *Farmer v. Tennessee Department of Safety, et al.*, No. 3:05-cv-84, this court found that Farmer's report to the TV reporter about the other trooper's use of work time was a matter of public concern. Ms. Hazelwood, however, was only defending her friend and not raising a matter of public concern even though her actions touched on Farmer's protected speech.

won, Laxton and others in the Department of Safety began a campaign of harassment and discrimination resulting in the termination of her employment.

In his motion for summary judgment, the defendant argues that there is insufficient proof of Laxton's knowledge of the plaintiff's political affiliation to make out this claim. Further, the defendant contends that there is little if any evidence of a causal connection between the alleged harassment and the plaintiff's political affiliation. Finally, the defendant argues that the plaintiff's employment would have been terminated notwithstanding any of the plaintiff's political activities because of her excessive absences.

The right of political association is well established, and support of a political candidate clearly falls into the scope of the right. *Sowards v. Loudon County*, 203 F.3d 426, 432 (6th Cir. 2000). To establish retaliation for engaging in constitutionally protected activity, a plaintiff must prove the following elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between the elements one and two– that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.* at 431 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). The focus is on whether the adverse employment action was motivated in substantial part by the plaintiff's constitutionally protected conduct. *Id.* "If the plaintiff meets her burden, the

15

burden then shifts to the defendants to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Id.*

As to the first element, the plaintiff contends that her protected activity was her affiliation with the Republican party. She stated in her deposition that she was a Republican, "born and raised," and that she usually voted for the Republican candidate. The only political activity that she claimed, however, was the presence of a bumper sticker on her car. She never described the bumper sticker or explained who the sticker supported. She also testified that she had "never been a political person really."

Concerning the second element, the plaintiff contends that Laxton subjected her to harassment and discrimination which resulted in her diagnosis of "panic and anxiety and depression." The effect of this was an ultimate finding that she was unfit for duty and the termination of her employment.

Finally, the plaintiff must show a causal connection between her protected activity and the alleged adverse employment actions of the defendant. This is where the plaintiff's claim fails. The court finds that the plaintiff has failed to set forth evidence that is sufficient to support a conclusion that Laxton knew or had reason to know of her Republican status. *See Hall v. Tollett*, 128 F.3d 418, 425 (6th Cir. 1997). First, the plaintiff claims that "everybody knew what everybody was," referring to her co-workers' political affiliations. However, when

16

specifically asked about the political affiliation of certain co-workers, she stated, "I have no idea." Second, the plaintiff was asked in her deposition if she ever told Laxton what her political affiliation was. She said, "I didn't have to." She went on to explain that she had a bumper sticker on her car which required that she not park in the THP parking lot. When she was asked if she knew that Laxton saw the bumper sticker, she said yes, "[b]ecause people kidded me about it in front of him, and he didn't laugh." In contrast, in a sworn affidavit submitted in support of his motion for summary judgment, Laxton states that he "did not have any idea what political affiliation/association she claimed, if any." Laxton further states that when he signed off on the plaintiff's 2004 evaluation, it "was not based in any manner upon any comments made by Hazelwood, nor was it based upon her political affiliation or association (all of which were unknown to me) or any speech she had voiced." The court finds that the plaintiff has put forth such minimal evidence of political activity that there is no support for an inference that the defendant knew of the plaintiff's political affiliation and retaliated against her because of it.

Furthermore, the court finds it telling that the plaintiff did not rely on this argument when describing her work situation for defendant McNeal at her fit-for-duty examination. She wrote five pages describing how Laxton was treating her and causing her medical problems, but there is not a single reference to politics. She describes Laxton's efforts to run her off, the stressful requirements

17

of her job, and the internal affairs investigation.  And, she claimed that Laxton "has persecuted me because of my illness & my age & anything else he can think of. . . . I resent this whole process because it is just his latest ploy to try to run me off & put his younger replacement in my spot."  But, there is no mention of any political motivation on Laxton's part.

In his motion for summary judgment, Laxton argues that even if the plaintiff has satisfied her burden of proof on her political association claim, the defendant has submitted more than sufficient proof that he would have taken the same action (termination) because of her panic attacks and excessive absences from work.  Laxton points out that the plaintiff had complained of stress for years and her medical problems were already manifesting themselves as absences from work before he was promoted to captain.  After Laxton was promoted, the plaintiff only worked a little over 50% of the time she was scheduled, which necessitated her duties being assigned to others.

The court finds that the plaintiff has not adduced sufficient evidence that her treatment and termination were motivated in substantial part by her limited political activity.  In the absence of such evidence, she has failed to make out a First Amendment political association claim, and summary judgment on this issue is appropriate.

### D.  Plaintiff's Due Process, § 1985, and Punitive Damages Claims

The plaintiff has apparently abandoned her substantive and procedural Due Process and punitive damages claims as evidenced by her failure to recognize the claims or respond to them in her response to the defendant's motion for summary judgment. Furthermore, neither party has made any arguments related to the plaintiff's § 1985 claim. These claims will be dismissed.

### III. Conclusion

For the reasons stated above, the court finds that defendant Laxton, sued in his individual capacity, is entitled to qualified immunity and summary judgment. An order reflecting this opinion will be entered.

ENTER:

*s/ Leon Jordan*
United States District Judge