IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

SHARON HAZELWOOD, )
)
    Plaintiff, )
)
v. ) No. 3:05-cv-356
)
TENNESSEE DEPARTMENT OF )
SAFETY, et al., )
)
    Defendants. )

## MEMORANDUM OPINION

This civil action is before the court on the motion of the following defendants sued in their official capacities: Commissioner of the Department of Safety Fred Phillips, Deputy Commissioner Tom Moore, Colonel Lynn Pitts, Captain Charles Laxton, Lieutenant Colonel Larry Rucker, Sergeant Dennis Murray, Deputy to the Governor Dave Cooley, and Travis McNeal, Ph.D. [doc. 92]. The plaintiff has responded [doc. 107], and the defendants have filed a reply brief [doc. 109]. Oral argument on the motion has been heard, and the motion is ripe for the court's consideration. For the reasons stated below, the defendants' motion for summary judgment will be granted.

In her complaint, the plaintiff alleges that after Governor Bredesen, a Democrat, was elected, defendant Phillips was appointed as Commissioner of the Department of Safety, which operates the Tennessee Highway Patrol ("THP"). She claims that defendant Phillips gave preferential treatment including promotions to department employees who had supported Bredesen. The plaintiff says that defendant Phillips used lower level supervisors to disparately treat employees who were Republicans or who had not supported Bredesen. She contends that defendant Laxton was promoted to Captain of the THP, and he began to "harass, retaliate and otherwise discriminate against those employees" who had not supported the Democratic candidate for governor of Tennessee. The plaintiff claims that she was one of those employees. The plaintiff says that Laxton unjustly harassed her about her job performance, took away tasks, responsibilities, and supervisory authority, and used other employees to carry out his harassment. The plaintiff further claims that Laxton ordered and conducted "bogus" internal affairs investigations concerning the plaintiff and that defendant Phillips finally ordered her to submit to a "fitness-for-duty" evaluation, the end result of which was the termination of her employment with the THP. She raises three causes of action pursuant to 42 U.S.C. §§ 1983 and 1985: (1) retaliation for exercising her First Amendment speech rights; (2) violations of her First Amendment rights of political association; and (3) violations of her Fifth and

Fourteenth Amendment procedural and substantive due process rights.[1] As to these defendants, the plaintiff is limited to prospective relief, that is, reinstatement to her position. *See* Docs. 64 and 65 (finding that the plaintiff may only recover prospective relief from state officials sued in their official capacities).

## I. Factual Background

The plaintiff began working at the THP in the Knoxville, Tennessee office about 1976. She rose through the ranks until she reached the position of Communications Dispatch Supervisor. For most of the years until the incidents related to this lawsuit, she routinely received an "exceptional" ranking on her employee evaluations.

In February 2003, following the election of Bredesen, the Democratic candidate for governor, defendant Laxton was promoted from sergeant to captain, skipping over the rank of lieutenant. The plaintiff alleges in her complaint that Laxton was promoted because he supported the election of Governor Bredesen. She also states in her response to the defendant's motion that "Laxton was a Democrat and had contributed heavily to Governor Bredesen's

---

[1] In her response to the motion for summary judgment, the plaintiff states that she has "two theories of recovery: (1) that she was unjustly harassed and terminated as a direct result of her political affiliation; and (2) that she was unjustly harassed and terminated as a direct result of the exercise of her Fourteenth Amendment rights [of] intimate association." In the Sixth Circuit, the right of intimate association is analyzed under the First Amendment. *See Sowards v. Loudon County*, 203 F.3d 426, 432 (6th Cir. 2000). The court also notes that the plaintiff appears to have abandoned her due process claims.

2002 election." Throughout the plaintiff's deposition she claims that "everybody knows what everybody is" when asked about co-workers' political affiliations. As far as the court can tell, there is no proof in the record, by way of sworn testimony or admissible documents, that supports her statements about Laxton's political affiliation. For purposes of this motion, however, the court will assume that Laxton is a Democrat and that the plaintiff could prove it at trial.

Laxton was in charge of the Knoxville office of the THP. The plaintiff's immediate supervisor was defendant Lieutenant Larry French. The plaintiff says that after Laxton was promoted she and other employees were called into his office. During her visit, she says that Laxton told her that she had been allowed to "run wild" and it was "coming to a stop." The plaintiff also stated in her deposition that Laxton told her on several occasions that "they wanted their people" in supervisory positions. She took that to mean Democrats. She also said that Laxton let her know that she was not on the "right side."

The only evidence in the record concerning the plaintiff's party affiliation and Laxton's knowledge of it comes from the plaintiff's deposition and Laxton's affidavit. When asked at her deposition, the plaintiff denied being a registered member of the Republican party but admitted that she usually voted for the Republican candidate. As to the governor's race, she stated that she had bumper stickers on her car, presumably for Republican candidates, but there was a policy that the employees had to park at the motel next door if they had political

bumper stickers on their cars. When asked about Laxton's knowledge of her political affiliation, she stated that he knew because "everybody knew what everybody was," and when some co-workers were teasing her about the bumper sticker, Laxton did not laugh. Laxton stated in his affidavit that he did not know and did not make any employment decisions based on the plaintiff's political affiliation.

Interestingly, when the plaintiff was asked about the political affiliations of co-workers, she denied knowing that information and stated that she "never paid attention to things like that" and that she had "never been a political person." Nevertheless, it was her opinion that the THP was a political organization and she stated that politics got her the job and promotions, but then admitted that she was hired under a Democratic governor and received promotions when Democrats were in office.

In October 2003, a co-worker, Lt. Farmer, was being investigated by defendant Colonel Rucker of internal affairs. She said that when she tried to speak up for Lt. Farmer, she was told to distance herself from Farmer and to worry about her own problems, not Farmer's.

Lt. French prepared an evaluation of the plaintiff's performance in April 2003, a few months after Laxton was promoted. She received "exceptional" rankings in all areas except her supervisory duties. There, she received only a "good" which is two levels below exceptional. Lt. French explained this ranking:

5

"Ms. Hazelwood has had a medical condition that prevents her from her ability as a (5) exceptional. Due to the medical problem her supervisory duty has been hampered because she has had to miss work." By memorandum dated November 11, 2003, the plaintiff received a written warning concerning her absences. Lt. French stated in the memorandum that she had taken 110 sick days during the previous twelve months. She was told that she would only be allowed to work her assigned shift and that she had to have a doctor's statement for all future sick leave. She was also advised of her appeal rights, but she did not appeal the findings in the memorandum.

The plaintiff's sick leave absences continued. She was next evaluated on July 6, 2004. Her ranking was "marginal" at that time. Lt. French summarized his evaluation as follows:

> Supervisor Hazelwood has met all the requirements set forth in her job responsibility. During this rating period Supervisor Hazelwood has worked approximately 55% of the year. Of approximately 262 work days she has worked only 144 complete days. Although these problems are not in her control, these problems keep her from performing her job responsibilities in a normal manner. Job responsibilities are not performed or are late due to these absences. Employee evaluations are not on time. Investigations are not completed in a timely manner. Meetings which require her attendance are sometimes not attended. . . . This evaluation is based on her performing her job responsibilities as a supervisor of several other employees who depend on her performance. I have assumed these job responsibilities in her absence. This Annual Evaluation was not conducted on the due date because I have not had the

> opportunity to conduct it with her due to her absences. I
> recommend that she receive all raises due to her as a
> state employee.

The plaintiff disagreed with the evaluation and wrote that additional responsibilities of her job resulted in her illness over the years. She then wrote that when she and Laxton first met to discuss her evaluation, she had a panic attack. When Lt. French met with her about a month later, she wrote that she "became sicker again." She stated that her extended illness was a "direct result of job stress as well as harassment and discriminating treatment. I have needed help instead of damnation."

The plaintiff also became the subject of several internal affairs investigations in August 2004. One complaint was filed by a co-worker who complained that the plaintiff had made threats towards her subordinates and falsified time sheets. Another co-worker complained about the plaintiff's hostile and intimidating behavior, falsification of time sheets, favoritism towards some co-workers, and the plaintiff's lack of authority to use the THP driver's license system. A complaint was also filed against the plaintiff for failing to respond appropriately to a request for help. Officers at the truck scales requested assistance in transporting a drunk driver. The plaintiff told the officers to call the county for assistance and gave them the number to call. She was given a written reprimand and a strong warning related to her failure to "properly answer a call for service." Lieutenant Rucker did not conduct these investigations.

In March 2004, the plaintiff applied for and was granted Family Medical Leave.[2] She testified that Laxton talked her into taking the leave so she could go home and get well. Her leave was intermittent, meaning that she could work some days but not others. Her doctors diagnosed her as having "panic and anxiety and depression." Laxton assigned her to the driver's license department because it was less stressful, an opinion with which the defendant did not agree, and she was transferred back to the THP.

In the fall of 2004, the Human Resources division ordered the plaintiff to undergo a fitness-for-duty examination.[3] The plaintiff completed a questionnaire prior to her examination. She stated that her Captain (Laxton) "deliberately puts extra stress on me to make me ill. . . . He causes me to have horrible panic attacks on purpose – thus causing me to work in a hostile work environment." She then stated in her five-page, hand-written Narrative Account:

> The circumstances that led to this "fitness-for-duty" evaluation are the same circumstances that are used to put extra stress on me and lead me to have severe panic attacks on my job. These being the continued,

---

[2] Interestingly, on the request for leave filled out by her doctor, it states that her symptoms caused by stress began August 28, 1999. The plaintiff explained this as the date she first sought medical treatment for her stress.

[3] General Order No. 222 of the Tennessee Department of Safety provides in relevant part:

> C. The Department reserves the right to send an employee to qualified professionals and physicians for a psychological/physical examination.
> D. In the event there is cause to believe an employee may not be capable of performing his/her duties, A director, Section Head or District/Division Captain may submit a request for a physical or psychological examination to determine his/her fitness for duty.

> relentless sheer determination of Captain Charles
> Laxton to run me off. . . . He found that I had problems
> with cumulative stress from all the years of working 2 &
> sometimes 3 shifts through the years when
> communications stayed so short-handed . . . it builds up.
> When he found out he began to use this on me in every
> way possible.. . . I think I will always love the job itself –
> and the people – most are like family to me.  If they
> would not ride me until I have the bad panic attacks I
> could work & stay caught up & even be free to do some
> extra things I've been wanting to get done.  However,
> after they do me that way I am sick for days. [After
> taking new medications] I feel better than I have in a
> long time, except when they start on me. . . . I have
> never understood why the Captain can't leave me alone.
> He has persecuted me because of my illness & my age.
> . . . I resent this whole process because it is just his
> latest ploy to try to run me off & put his younger
> replacement in my spot.

The fitness-for-duty examination was conducted by defendant, Dr. Travis McNeal, a psychologist employed by the Department of Safety.   On December 1, 2004, after conducting some tests, Dr. McNeal recommended that:

> *Ms. Hazelwood be considered unfit for duty as a
> dispatcher or dispatch supervisor.*  She currently suffers
> from psychopathology, specifically an anxiety disorder
> inclusive of panic attacks, that compromises her ability
> to perform the essential duties of the job.  Given the
> integral role of the dispatcher in routinely managing
> crisis situations, her impairment could also potentially
> place others at risk.

[italics in original].  It is noted that the plaintiff's personal psychiatrist disagreed with this evaluation.  He agreed that the plaintiff was suffering from "major depression and panic disorder" and subject to panic attacks as a result of the

work environment stress. But, he opined that the determination that she was not fit-for-duty was tainted because McNeal was affiliated with the Department of Safety and that a neutral environment would be necessary to get an accurate result.

Laxton recommended that the plaintiff's employment be terminated because of Dr. McNeal's finding that she was unfit for duty and her "habitual absenteeism," and defendants Pitts and Phillips concurred. The plaintiff requested a Level III Due Process Hearing, which was held on January 19, 2005. Defendant Pitts was the hearing officer and he concurred with Laxton's recommendation that the plaintiff's employment be terminated. Again, defendant Phillips decided to terminate the plaintiff's employment with the Department of Safety for failing a "Fit-For-Duty Psychological Evaluation," concurring with Pitts's and Laxton's recommendations. He noted in his memorandum to the plaintiff that she had taken over 300 hours of sick, annual and compensatory leave since August 2004 and that this "continued pattern of absenteeism has resulted in you not being able to perform the major functions of your job, and placed an unreasonable hardship on your work unit." The plaintiff appealed this decision through the Department of Safety grievance procedures, and on March 3, 2004, the decision to terminate the plaintiff's employment was upheld by defendant Phillips.

The only reference to defendant Moore in the record is that his name appears in the "cc" list on the termination memoranda prepared by Phillips. Defendant Murray's name is referenced twice in Laxton's affidavit: first, as the person to whom the plaintiff was to report her absences if Lt. French was not available and second, as the officer who helped the plaintiff when she had one of her panic attacks.

## II. **Legal Discussion**

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted, "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." As the Supreme Court stated in *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986), this "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Thus, the moving party's burden may be discharged by showing that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. In order for a non-moving party to defeat a motion for summary judgment, the non-moving party must come forward with persuasive evidence to support his

or her claim or demonstrate that there is a genuine material factual dispute; that is, the non-moving party must produce evidence on which the jury could reasonably find for the non-moving party. *Id.* at 324.

Before embarking on a discussion of official capacity liability, it is necessary to note that the court has dismissed the claims against defendant Laxton sued in his individual capacity. *See* Docs. 174 and 175. The court found that the plaintiff failed to make out a First Amendment speech claim because she could not show that her speech, speaking out for her friend Lt. Farmer, was a matter of public concern. The court also found that the plaintiff did not establish that defendant Laxton retaliated against her because of her political association because her evidence of political activity was so minimal that there was no causal connection between her political activity and any adverse employment actions. Thus, defendant Laxton was granted qualified immunity.

The plaintiff's claims against the defendants sued in their official capacities are, in effect, claims against the State of Tennessee. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (official capacity suits are "another way of pleading an action against an entity of which an officer is an agent"). The State cannot be held liable for an injury inflicted solely by its employees or agents. *See Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978); *see also Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996) (stating that plaintiff cannot base her claim against the county solely on an individual's

conduct). Rather, the plaintiff must show that the State is a wrongdoer because of an "officially executed policy, or the toleration of a custom" that caused the constitutional violation. *Doe*, 103 F.3d at 507. "[T]he finding of a custom or policy is the initial determination to be made in any municipal liability claim." *Id.* at 509. The plaintiff must identify the policy or custom, connect the policy or custom to the State and show that the particular injury was incurred because of execution of that policy or custom. *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994).

In this case, the plaintiff has not identified any policy of the State that caused the alleged harassment and termination of her employment. "Policy" is defined as "a course of action consciously chosen from among various alternatives," and usually involves some sort of legislative or other affirmative action. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). It appears instead that the plaintiff is relying on custom to make out her claim. A "custom" must "'be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Doe*, 103 F.3d at 507 (quoting *Monell*, 436 U.S. at 691). The custom upon which the plaintiff pins her claims is described in her response to the motion for summary judgment as: "politics has permeated the hiring, assignment and promotion with the THP . . . and has come to be understood as 'just the way it is.'" She cites to a document known as the "Kroll report," but the report is not in the record and the court cannot rely on the report to find a basis for the plaintiff's custom claim.

Furthermore, her assertion that politics controls the hiring, assignment and promotions in the THP is belied by her own testimony. She testified that as a Republican she was hired and promoted under Democratic administrations.

There is another method the plaintiff may use to prove the existence of an illegal State policy or custom; the plaintiff can identify the actions taken by officials with final decision-making authority to establish State custom with respect to the actions taken. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). There is nothing in this record that connects defendants Moore, Murray, Rucker and Cooley to any illegal custom that resulted in the alleged deprivation of the plaintiff's rights. In fact, the court could not find a reference to Cooley in the record at all, and the only reference to Moore was that he was sent copies of termination memoranda. The only references to Murray are in Laxton's affidavit, and the only reference to Rucker is that he conducted Lt. Farmer's internal affairs investigation – not the plaintiff's.

Next, although Laxton was in charge of the Knoxville THP, the court has already found that he did not violate the plaintiff's constitutional rights. Defendant Phillips clearly had decision-making authority as Commissioner of the Department of Safety, but the only evidence in the record is that he merely concurred in the recommendations of others. He signed off on the recommendations of Laxton and Pitts that the plaintiff's employment be

terminated based on the finding of McNeal that she was not fit for duty. There is no evidence that he ordered or controlled what happened to the plaintiff in the Knoxville THP office.

Defendant Pitts was the hearing officer who considered the plaintiff's appeals of the termination decision. After considering the evidence, he recommended to Phillips that she be terminated. Finally, the plaintiff does not argue that McNeal was a decision-making official for the State. He did fitness-for-duty evaluations for the State, but had no decision-making authority related to the Department of Safety. It is true that the plaintiff disagrees with McNeal's findings, but that is not sufficient to establish that his findings were the result of an unconstitutional custom. Therefore, the court finds that the plaintiff cannot make out a custom of the THP relying on the actions of decision-making officials.

In any event, assuming that the plaintiff could establish such a custom of political hiring, assignment and promotion within the THP, the plaintiff has not presented any evidence of a direct causal link between the custom and the alleged deprivations of her constitutional rights. *See Doe*, 130 F.3d at 508. As noted above, the plaintiff failed to establish that the alleged harassment she received from Laxton was politically motivated, because evidence of her political activities was so minimal. Thus, the plaintiff has not shown that the alleged harassment by Laxton and her eventual termination were taken pursuant to a custom of the THP, or that the harassment and termination were due to any

unconstitutional conduct on the part of the State officials. *See Mattox v. City of Forest Park*, 183 F.3d 515, 523 (6th Cir. 1999) ("If the plaintiffs have failed to state a claim for violation of a constitutional right at all, then the City of Forest Park cannot be held liable for violating that right any more than the individual defendants can. The inquiry is precisely the same in both cases.").

### III. Conclusion

For the reasons stated above, the court finds that defendants Phillips, Moore, Pitts, Laxton, Rucker, Murray, Cooley and McNeal, sued in their official capacities, are entitled to summary judgment. An order reflecting this opinion will be entered.

ENTER:

　　　*s/ Leon Jordan*　　
United States District Judge